Todd A. Seaver (SBN 271067)
BERMAN DEVALERIO
One California Street, Suite 900
San Francisco, CA 94111
Telephone:    (415) 433-3200
Facsimile:    (415) 433-6382
tseaver@bermandevalerio.com

Kit A. Pierson
Meghan M. Boone
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Telephone:    (202) 408-4600
Facsimile:    (202) 408-4699
kpierson@cohenmilstein.com
mboone@cohenmilstein.com

Attorneys for Plaintiff

ORIGINAL
FILED

AUG 3 0 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

DMR

CV 12 4582

| | |
|---|---|
| LAITH ULABY, individually and on behalf of others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | CLASS ACTION |
| EXPEDIA, INC., HOTELS.COM LP; TRAVELOCITY.COM LP, SABRE HOLDINGS CORPORATION, PRICELINE.COM INCORPORATED, BOOKING.COM B.V., BOOKING.COM (USA), INC., ORBITZ WORLDWIDE, INC., HILTON WORLDWIDE INC., STARWOOD HOTELS & RESORTS WORLDWIDE, INC., MARRIOTT INTERNATIONAL, INC., TRUMP INTERNATIONAL HOTELS MANAGEMENT, LLC, KIMPTON HOTEL & RESTAURANT GROUP, LLC, INTERCONTINENTAL HOTELS GROUP RESOURCES, INC., and JOHN DOES 1-100, | JURY TRIAL DEMANDED |
| Defendants. | |

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.     NATURE OF ACTION ............................................................ 1

II.    PARTIES .......................................................................... 3

     A.     Plaintiff............................................................... 3

     B.     Defendants.......................................................... 4

III.   AGENTS AND CO-CONSPIRATORS .................................... 5

IV.   JURISDICTION AND VENUE ............................................. 6

V.     SUBSTANTIVE ALLEGATIONS.......................................... 6

     A.     The Online Retailer Defendants Become Indispensable to the Hotel Defendants.......................................................... 6

     B.     The Online Retailer Defendants Use their Dominance to Impose the RPM Scheme and Prevent Discounting...................................... 8

     C.     The RPM Scheme Has Purposefully Resulted in "Rate Parity" for Room Reservations through the Online Retailer Defendants - Allowing the Online Retailer Defendants to Always Guarantee the "Best" (Albeit Same) Prices ........ 15

     D.     Investigation by Governmental Authorities........................... 21

VI.   MONOPOLY/MARKET POWER ......................................... 22

VII.   MARKET EFFECTS OF AND ANTITRUST INJURY DUE TO DEFENDANTS' ANTICOMPETITIVE CONDUCT ..................... 23

VIII.   CLASS ALLEGATIONS ..................................................... 24

IX.   TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, EQUITABLE TOLLING AND CONTINUING VIOLATIONS .................................................................. 26

X.     COUNTS.......................................................................... 27

COUNT I
     VIOLATION OF 15 U.S.C. § 1 (AGREEMENTS UNREASONABLY RESTRAINING TRADE) ...................................................... 27

COUNT II
     VIOLATION OF THE CARTWRIGHT ACT ...............................
     (CALIFORNIA BUSINESS & PROFESSIONS CODE SECTIONS 16720, *ET SEQ.*) (CALIFORNIA CLASS ONLY)............................ 28

COUNT III
     FOURTH CAUSE OF ACTION (VIOLATIONS OF CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*)........................................................ 28

COUNT IV
     FIFTH CAUSE OF ACTION (VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200 ET. SEQ.) ............................ 30

RELIEF REQUESTED ............................................................... 31

1    Plaintiff Laith Ulaby, by and through his attorneys, on behalf of himself and all others

2    similarly situated, brings this Class Action Complaint against Expedia, Inc. ("Expedia"),

3    Hotels.com LP ("Hotels.com"), Travelocity.com LP ("Travelocity"), Sabre Holdings Corporation

4    ("Sabre Holdings"), Booking.com B.V., Booking.com (USA), Inc. (Booking.com B.V. and

5    Booking.com (USA), Inc. will be referred to as "Booking.com"), Priceline.com, Inc.

6    ("Priceline"), and Orbitz Worldwide, Inc. ("Orbitz") (collectively, "the Online Retailer

7    Defendants"), and Hilton Worldwide,. Inc. ("Hilton"); Marriott International, Inc. ("Marriott");

8    Trump International Hotels Management, LLC ("Trump"); InterContinental Hotels Group

9    Resources Inc. ("InterContinental"), Starwood Hotels & Resorts Worldwide, Inc. ("Starwood"),

10   and Kimpton Hotel & Restaurant Group, LLC ("Kimpton") (collectively, "Hotel Defendants")

11   and allege, based upon personal knowledge as to himself and his own acts, and as to all other

12   matters upon information and belief, as follows:

## I.    NATURE OF ACTION

13

14   1.    Plaintiff purchased hotel room reservations online ("Room Reservations") directly

15   from one or more of the Online Retailer Defendants in the United States: Plaintiff brings this

16   direct purchaser antitrust action to challenge the Online Retailer Defendants' conspiracy with the

17   Hotel Defendants to enter into, maintain and/or enforce minimum resale price maintenance

18   ("RPM") agreements.  Plaintiff seeks damages and equitable relief from Defendants under

19   Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and under California Business &

20   Professions Code §§ 16720, *et seq.*

21   2.    The Online Retailer Defendants are among the dominant online travel companies

22   that act as retailers for Room Reservations in California and the United States.  Here, the Online

23   Retailer Defendants conspired with the Hotel Defendants and agreed to impose an RPM scheme

24   that would fix the retail price for Room Reservations at the price the Hotel Defendants were

25   selling the Room Reservation ("Rack Rates") and restrain competition for Room Reservations

26   ("Defendant Retailer-Hotel Agreements") in the market for online reservations.  The Defendant

27   Retailer-Hotel Agreements included express terms to set, maintain, and enforce minimum prices

28

1  at the Rack Rates.[1]  The Defendant Retailer-Hotel Agreements restrained price competition by

2  requiring the Defendant Hotel Defendants to impose, amend, enforce, and/or heighten

3  enforcement of minimum resale price maintenance agreements with respect to price-cutting

4  Online Retailers, and/or to prevent price-cutting Online Retailers from discounting Room

5  Reservations or engaging in the profit-lowering effects of retail price competition for Room

6  Reservations.

7        3.   Pursuant to the Defendant Retailer-Hotel Agreements, the Hotel Defendants were

8  charged with enforcing the RPM scheme against Online Retailers that competed or attempted to

9  compete with the Online Retailer Defendants on price.  Thus the Defendant Retailer-Hotel

10  Agreements were part of an anti-competitive scheme under which the Online Retailer Defendants

11  leveraged their substantial market power and dominance to induce the Hotel Defendants into

12  agreeing to do one or more of the following: (a) impose minimum resale price maintenance

13  agreements on the Retailers ("Hotel-Online Retailer Agreements");[2] (b) enforce the Hotel-Online

14  Retailer Agreements as to the Online Retailers; and/ or (c) refuse to supply or cut off supply to

15  price-cutting competing Online Retailers.

16        4.   As a result of the concerted RPM scheme by the Online Retailer Defendants, each

17  Defendant Retailer-Hotel Agreement with the major hotel chains including the Hotel Defendants

18  provides that Room Reservations will not be sold to Plaintiff and members of the Class for less

19  than the Rack Rate.  Because all of the Online Retailer Defendants have the same clause in most

20  or all of their contracts, whether oral or written, *none* of the Online Retailer Defendants compete

21  with any of the other Online Retailer Defendants on price, *and* the retail rates for Room

22  Reservations are set at Rack Rates and thus are virtually identical amongst the Online Retailer

23  Defendants and each Hotel.

24        5.   Defendant Sabre, which operates Travelocity.com, has admitted that this RPM

25  scheme:

26  _____

27      [1] The Agreements are comprised of a combination of contracts and conspiracies, whether
oral or written, express or tacit.

28      [2] Hereinafter, the Defendant Retailer-Hotel Agreements and Hotel-Online Retailer
Agreements may be collectively referred to as the "Agreements."

'is a standard industry practice,' said Nancy St. Pierre, as spokeswoman for Sabre Holdings, which operates Travelocity.com.

It's done in part 'so that the customer can have the confidence that they will get the best rate, that they don't have to go on 18 different sites,' she said.[3]

6.     However, the Online Retailer Defendants' "best price guarantees" are nothing more than a cover for their conspiracy to fix prices, such that the Online Retailer Defendants do not have to compete on price but can offer the "best price" to their customers knowing that all of the Online Retailer Defendants will offer the *same* anti-competitive price. There is in reality no "best price" but instead there is a fixed uniform price.

7.     Absent Defendants' anti-competitive and deceptive conduct, Plaintiff and the other Class members would have paid less for each of the Room Reservations purchased during the Class Period.  The direct consequence of Defendants' unlawful conduct was that Plaintiff and other Class members paid overcharges on their purchases of Room Reservations throughout the Class Period.  Plaintiff thus seeks damages and equitable relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. § § 15(a) and 26, for violations of Section I of the Sherman Antitrust Act, 15 U.S.C. § 1, and for violation of Cal. Bus. & Prof. Code § 17500 *et seq.*  In addition, a subclass of California residents who purchased Room Reservations brings a claim for violations of California Business & Professions Code Sections 16720, *et seq.*

## II.     PARTIES

**A.     Plaintiff**

8.     Laith Ulaby is a resident and citizen of San Francisco, California.

9.     Mr. Ulaby has, during the Class Period, purchased Room Reservations for hotel rooms through several of the Online Retail Defendants.  Mr. Ulaby has been damaged by the conduct alleged herein.

**B.     Defendants**

10.     Defendant Expedia, Inc. is a Delaware corporation with its principal place of

---

[3]  Karin Robinson-Jacobs, "Practice that holds rates steady among Hotel Defendants, travel sites coming under fire," Dallas Morning News (Nov. 16, 2010), reprinted at http://hsmaidfw.blogspot.com/ (last accessed August 15, 2012).

CLASS ACTION COMPLAINT                                                          - 3 -

1    business at 333 108th Avenue NE, Bellevue, Washington 98004.

2         11.     Defendant Hotels.com LP is an affiliate of Expedia.  Hotels.com LP is a Texas

3    limited partnership with its headquarters located at 10440 North Central Expressway, Suite 400,

4    Dallas, Texas 75231.

5         12.     Defendant Travelocity.com LP is a Delaware limited partnership with its principal

6    place of business located at 3150 Sabre Drive, Southlake, Texas 76092.  Travelocity is owned by

7    Defendant Sabre.

8         13.     Defendant Booking.com B.V. is a company based in Amsterdam, the Netherlands,

9    with its principal place of business at Herengracht 597, 1017 CE, Amsterdam, Netherlands.

10   Booking.com B.V. owns and operates Booking.com, the leading worldwide online Room

11   Reservations agency by room nights sold, attracting over 30 million unique visitors each month

12   via the Internet from both leisure and business markets worldwide.  Booking.com B.V. is a

13   wholly owned subsidiary of Priceline.com Incorporated.

14        14.     Defendant Booking.com (USA), Inc. is a Delaware corporation with its primary

15   place of business located at 100 William Street, Suite 750, New York, New York 10038.

16   Booking.com (USA), Inc. is a wholly owned subsidiary of Priceline.com Incorporated.

17        15.     Defendant Priceline.com Incorporated is a Delaware corporation with its primary

18   place of business located at 800 Connecticut Avenue, Norwalk, Connecticut 06854.

19        16.     Defendant Orbitz Worldwide, Inc. is a Delaware corporation and its corporate

20   headquarters are located at 500 W. Madison Street, Suite 1000, Chicago, Illinois 60661.

21        17.     Defendant Sabre Holding Corporation, incorporated in Delaware, is headquartered

22   at 3150 Sabre Drive, Southlake, Texas 76092.

23        18.     Defendant Intercontinental Hotels Group Resources, Inc. is a Delaware

24   corporation with its primary place of business located at 3 Ravinia Drive, Suite 100, Atlanta,

25   Georgia 30346-2149.

26        19.     Defendant Starwood Hotels & Resorts Worldwide, Inc. is a Maryland corporation

27   with its principal place of business at One StarPoint, Stamford, Connecticut 06902.  Starwood's

28   hotels are primarily operated under the brand names St. Regis®, The Luxury Collection®,

CLASS ACTION COMPLAINT                                                              - 4 -

Sheraton®, Westin®, W®, Le Meridien®, Four Points® by Sheraton, Aloft® and Element®.

20.    Defendant Marriott International, Inc. is a Delaware corporation with its principal place of business at 10400 Fernwood Road, Bethesda, Maryland 20817-1102.

21.    Defendant Trump International Hotels Management, LLC, doing business as The Trump Hotel Collection, is a Delaware limited liability company headquartered at 725 Fifth Avenue, New York, New York 10022.

22.    Defendant Hilton Worldwide, Inc. is a Delaware company doing business as Hilton Hotels & Resorts with its primary place of business located at 7930 Jones Branch Drive, McLean, Virginia 22102.

23.    Defendant Kimpton Hotel & Restaurant Group, LLC is a Delaware limited liability company with its principal place of business located at 222 Kearny Street, Suite 200, San Francisco, CA 94108.

### III.    AGENTS AND CO-CONSPIRATORS

24.    Various other persons, firms and corporations, not named herein as Defendants have participated as co-conspirators with the Defendants and have performed acts and made statements in furtherance of the conspiracy.  Some of these firms are as yet unidentified.  The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

25.    Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

26.    Whenever this complaint refers to an act, deed or transaction of a corporation or entity, the complaint is alleging that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

#### IV.    JURISDICTION AND VENUE

27.    Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15 (a), and 28 U.S.C. §§ 1331 and 1337, because the action arises under the laws of the United States.

28.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the Defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district.

29.    Intradistrict Assignment:  Assignment to the San Francisco or Oakland division of this Court is proper pursuant to Northern District of California Local Rule 3-2(d) because a substantial part of the events giving rise to the claims arose in this District.

#### V.    SUBSTANTIVE ALLEGATIONS

**A.    The Online Retailer Defendants Become Indispensable to the Hotel Defendants**

30.    As recently as 1997, the concept of an "internet travel company" or Online Retailer - an entity organized to effectuate travel plans, reservations and purchases via the worldwide web - was virtually unknown.  In recent years, the internet travel industry has seen explosive growth.  By some estimates, more than half of all hotel bookings in the United States are made online, many through internet travel companies owned by the Online Retailer Defendants.

31.    Through their web portals, the Online Retailer Defendants allow consumers to rent hotel rooms in many different hotels throughout the country and the world.  These companies offer their services to Hotel Defendants and consumers through several different business models, including the "Agency Model," the "Merchant Model,"[4] and/or the "Wholesale Model."

---

[4]    The Agency Model and the Merchant Model are described in the 2002 annual report of Defendant Expedia, Inc.as filed with the Securities and Exchange Commission on Form 10-K on March 31, 2003, and the 2004 Annual Report on Form 10-K as filed with the SEC of IAC/Interactive Corp. (the parent company - at that time - of Expedia.com, Hotwire.com and Hotels.com), p.9.

32.     Under the Agency Model, Online Retailers charge a "service fee" to hotel operators on a transaction basis for booking customers into rooms at a given hotel and the consumer pays the hotel for the room directly. Under the Agency Model, the hotels should be setting - and the Online Retailers should be requiring - a competitive price for Room Reservations to increase business and compete against other Online Retailers offering the same service.

33.     Under the Merchant Model, the Online Retailers do not function merely as service providers collecting a fixed transaction fee from the hotels. Rather, the Merchant Model consists of two independent but related transactions whereby an internet travel company: (i) obtains access to an inventory of hotel rooms at rates negotiated with the Hotel Defendants ("wholesale" rates); and (ii) then sells the rooms to consumers at higher rates ("retail" rates), keeping the difference as profit. Under this Merchant Model, the Online Retailers should be competing on price by increasing or decreasing the margin added to the wholesale rates to set the retail rate.

34.     The third model is the "Wholesale Model," whereby smaller price-cutting Online Retailers obtain-access to rooms through wholesalers. Wholesalers, or intermediaries between the Online Retailers and the hotels, work directly with Hotel Defendants to obtain last minute blocks of rooms that need to be filled. The wholesalers then make those rooms available to smaller Online Retailers at a wholesale rate. The Online Retailers then, like in the Merchant Model, sell the rooms to consumers at higher retail, keeping the difference as profit. Under this Wholesale Model, the Online Retailers should also be competing on price by increasing or decreasing the margin added to the wholesale rates to set the retail rate.

35.     Through the Agency Model and Merchant Model, the Online Retailer Defendants gained a dominant presence in the online sale of Room Reservations. The Online Retailer Defendants now hold more than a 50 percent market share in the internet travel business market. Just Expedia and its subsidiaries alone account for approximately 50% of the internet travel business market. Moreover, currently, the Online Retailer Defendants have become increasingly important to the Hotel Defendants' business – generating as much as 50% of the Hotel Defendants' Room Reservation traffic. Thus, the Hotel Defendants believe that they need access to the Online Retailer Defendants' distribution network.

**B.      The Online Retailer Defendants Use their Dominance to Impose the RPM Scheme and Prevent Discounting**

36.     As a result of their dominance, and knowing that the Hotel Defendants cannot afford to lose access to their distribution network, the Online Retailer Defendants devised an illegal RPM scheme to combat new or more efficient internet retailers, including those that obtained access to hotel rooms through the Wholesale Model, by exacting agreements from the Hotel Defendants that desired to sell Room Reservations through the Online Retailer Defendants to require, on penalty of termination and as a condition of doing business with the Online Retailer Defendants, that the Hotel Defendants ensure that competing online retailers refrain from discounting from the Rack Rate.

37.     The Defendant Retailer-Hotel Agreements are and were part of an overall agreement to impose and enforce the RPM scheme.  For example, in 2004, multiple hotels, including Defendants Hilton and Kimpton, and Online Retailers, including Defendant Priceline, met together in Las Vegas for EyeforTravel's second annual Revenue Management and Pricing in Travel conferences.[5]  At the conference, Defendants Hilton, Kimpton and Priceline discussed "rate parity" and "pricing strategies."  In fact, Jimmy Shu, VP Revenue Management and Distribution at Kimpton led a presentation to "address the issues associated with adapting rate parity across all distribution channels. . . ."  EyeforTravel has annually sponsored these conferences, and the attendees have expanded to include nearly all of the Defendants.[6]

38.     As part of the Defendant Retailer-Hotel Agreements, the Hotel Defendants demonstrated their compliance by requiring that competing online retailers agree to raise and maintain retail prices at the Rack Rate.  As a further sign of their agreement with the Online Retailer Defendants, in some instances, the Hotel Defendants threatened Online Retailers with legal action and/or refused to allow Online Retailers, such as Skoosh.com, to sell Room Reservations if the Online Retailers refused to price fix and maintain resale prices at the Rack

---

[5]  http://www.hotel-online.com/News/PR2004__2nd/May04_EyeForTravel.html (last accessed August 17, 2012).
[6]  http://events.eyefortravel.com/travel-distribution-summit-north-america/past-attendees.php (last accessed August 17, 2012).

1    Rate in compliance with the RPM scheme.  Further pursuant to their agreement with the Online

2    Retailer Defendants, in some instances, the Hotel Defendants required the wholesalers to stop

3    providing rooms to price-cutting Online Retailers, such as Skoosh.com, if they refused to price fix

4    and maintain resale prices at the Rack Rate.

5          39.    For example, Skoosh has publicly complained that it tried to sell discounted Room

6    Reservations on its online travel site but was thwarted by the resale price maintenance scheme:

> 'We were openly discounting and hotels would email, call and threaten
> legal action,' Skoosh told the BBC.
>
> 'Either we'd have to raise prices or take the hotels off our list,' said
> Dorian Harris from Skoosh.[7]

10         40.    In fact, Skoosh has claimed that the Agreements have "created a Mafia-style

11   atmosphere and an intolerable climate for new businesses.  Skoosh has been directly threatened

12   and, in turn, has defended its right to discount hotel prices."[8]

13         41.    Skoosh published a letter dated August 31, 2010, from its CEO to Online Retailer

14   Defendant and Skoosh's competitor Booking.com, complaining about Booking.com's

15   enforcement of the Defendant Retailer-Hotel Agreements.  The letter states, in part:

> Both personally, and even as a direct competitor, I was always a fan
> of Booking.com.  Yours was one of the better hotel booking sites I
> always thought, with some innovative features.  However, my rosy
> picture fast disappeared last winter when Skoosh started being
> pursued by your business partners insisting that we raise our hotel
> prices to the same as yours.  I'm hoping you can find the time to
> address some of the points below and restore my faith in your
> company.
>
> Some background then.  Earlier this year we started getting some
> calls from angry and confused hoteliers insisting that we were
> selling their rooms too cheaply.  I called them back to work out what
> was going on and they mostly told me that Booking.com had been
> on to them threatening all sorts of nonsense if they didn't either
> remove their hotel from Skoosh or force Skoosh to raise its prices.
>
> I wondered how this was all happening so quickly and then I did a
> little research and found that Booking.com has an active policy of
> maintaining the same prices for all companies across the internet.  I
> even found a job ad of yours looking for 'Rate Parity Associates'.  It

[7]  http://www.bbc.co.uk/news/business-11330463 (last accessed August 5, 2012).

[8]  http://www.tnooz.com/2012/07/31/ news/ regulator-accuses-expedia-booking-com-and-Intercontinental-in-hotel-competition-infringement-probe/ (last accessed August 5, 2012).

CLASS ACTION COMPLAINT                                                                   - 9 -

seems like you've got a whole team out there beavering away to 'find any rate inconsistencies between Booking.com and their competitors.' They're doing a good job I have to say. The hoteliers you work with are certainly concerned. One wrote to ask me to close out their hotel on Skoosh: 'just to avoid the penalty that [Booking.com] is threatening us about'.

Some were less friendly. Many of the hoteliers wrote letters to me threatening legal action. One of them had a colleague of yours on one line and me on the other. It seemed that your colleague was insisting that if we hadn't removed their hotel from Skoosh by the end of the phone call Booking.com would cancel the contract with them. They were very scared.[9]

42.     The Rate Assured Hotel Program implemented by Defendant Sabre (which owns Defendant Travelocity) requires the Hotel Defendants to enforce the RPM scheme:[10]

For Suppliers

**Sabre Rate Assured™ Hotel Program**

Are you *Rate Assured*?

*Sabre Travel Network* has already begun measuring properties to validate rate parity across properties prior to the official launch. So make sure your properties are rate compliant!

   (b) If it is determined that a property is not providing rate parity in the program, it will essentially be placed on "Probation" status.
   (c) If a property is not providing rate parity in the subsequent measurement, *Sabre* will consider the hotel "In Violation"...

43.     In fact, Sabre also runs a division called "Sabre Hospitality Solutions," which expressly markets and encourages hotels to adopt rate parity – in effect, the RPM scheme. See, e.g., http://www.sabrehospitality.com/blog/2011-10-27/how-hotels-can-leverage-ota-relationships-without-killing-their-pricing-strategy; http://www.sabrehospitality.com/blog/2011-11-30/three-top-trends-in-hospitality-marketing-anddistribution-to-consider-when-planning-for-2012.

44.     Thus, pursuant to the Defendant Retailer-Hotel Agreements, the Hotel Defendants are enforcing the RPM scheme on price-cutting competing online retailers. For example:

---

[9] http://dorian.skoosh.com/open-letter-to-kees-koolen-ceo-at-booking-com/ (last accessed August 5, 2012).
[10] http://dorian.skoosh.com/open-letter-to-f-t-c-chairman jon-leibowitz/ (last accessed August 16, 2012).

CLASS ACTION COMPLAINT                                                                 - 10 -

a.     Defendant Hilton required Skoosh's wholesale supplier in the United States, AlliedTPro, to entirely cut off its contract with Skoosh as a result of Skoosh's discounting and Defendant Hilton's enforcement of the Defendant Retailer-Hotel Agreements.  AlliedTPro wrote to Skoosh: "Trust me I would welcome the additional business but cannot risk our contracts with Hilton."[11]

b.     Defendant Trump expressly admitted it was enforcing the Defendant Retailer-Hotel Agreements, emailing Skoosh:[12]

**From:** ████████████████████████████
**Sent:** 10 May 2010 18:27
**To:** Dorian Harris
**Subject:** RE: New inquiry was submitted on Skoosh.com

The simple answer is; if we do not maintain parity with all, we are threatened with poor placement on sites and worst case... removal of hotel from sales sites. That is the way the OTA's operate in USA. Expedia threatens if Travelocity gets lower rate and vice-versa. It is a vicious cycle if we get out of parity.
I think the model in Europe is built to operate more competitively but that is not the model here. (Much as I wish it was the same as Europe!) I hope this helps you understand why we must be strict with what is offered on all websites.
Thanks,

████████████████████████████
Trump International ████████████

c.     Defendant Intercontinental wrote to Skoosh "demanding that Skoosh either raise[] its rates to the same as the hotels and its other distribution partners (a practice known in the industry as 'rate parity' ***) or remove the hotels entirely from our site."[13]

d.     In 2003, Defendant Marriott announced "a sweeping overhaul of its transient pricing, bringing parity to all Marriott distribution channels – offline and online."[14] During the Class Period, Marriott was among the Hotel Defendants threatening Skoosh.com with legal action and/or the withdrawal of their Room Reservations if Skoosh.com did not maintain rate parity.

---

[11] http://dorian.skoosh.com/open-letter-to-f-t-c-chairman jon-leibowitz/ (last accessed August 15, 2012).
[12] http://dorian.skoosh.com/open-letter-to-f-t-c-chairman jon-leibowitz/ (last accessed August 16, 2012).
[13] http://dorian.skoosh.com/open-letter-to-william-baer-arnold-porter-llp/ (referring to Holiday Inn New York) (last accessed August 16, 2012).
[14] http://www.businesstravelnews.com/More-News/Marriott-Revamps-Pricing--Offers-Complete-Parity,-Curtails-Fixed-Consortia-Rates/?a=btn (last accessed August 17, 2012).

1           e.         Defendant Starwood enforces the RPM scheme. "In one email to a hotel

2 discounter, an executive at Starwood, which runs Le Meridien, Westin, W and Sheraton hotels,

3 said: 'Should a wholesaler decide to sell the rooms on a room only basis, he has to make sure that

4 the per contract agreed minimum mark-up is guaranteed.' The employee said the 'violation' of

5 Starwood's Best Rate Guarantee was 'really serious' and the breach was reported to the Brussels

6 headquarters."[15]

7       45.      Similarly, Kayak.com, which is a price comparison website, told Skoosh on

8 several occasions that it had to "play the Orbitz game,"[16] *i.e.* maintain rate parity, or Kayak would

9 no longer publish Skoosh's prices. Kayak apparently felt pressured to enforce rate parity on

10 behalf of the Online Retailer Defendants because, for example, Orbitz accounted for 18.8% of

11 Kayak's total revenues and Expedia and its affiliates accounted for 24.9% of Kayak's total

12 revenues for the nine months ended September 30, 2010.[17] After Skoosh reported the RPM

13 scheme to governmental authorities, Kayak stopped publishing Skoosh's prices on its price

14 comparison site.

15       46.      Each of these actions was taken directly because of the pressure the Online

16 Retailer Defendants were placing on Hotel Defendants to protect the Online Retailer Defendants'

17 margins by enforcing the RPM scheme. The Hotel Defendants enforced the RPM scheme

18 because they feared losing access to the Online Retailer Defendants' website to sell their rooms if

19 they did not. As one industry consultant explained:

20           'I don't know that there's been enough public questioning of this [rate

21           parity] practice,' said Ashwin Kamlani, founder of Hotel Internet Help Inc., which
          helps independent hotels get more sales via cyberspace.

22

23           'The hotels enforce rate parity because they fear the consequences of not
          maintaining rate parity,' he said. 'They fear having their hotel dropped to page 6 or

24           even pulled off their largest producing [online travel agents] sites, which translates

25

_____

26     [15]  http://www.telegraph.co.uk/finance/newsbysector/retailandconsumer/8467755/Hotels-face-inquiry-in-price-fixing-scandal.html (last accessed August 17, 2012).

27     [16]  http://dorian.skoosh.com/open-letter-to-steve-hafner-c-e-o-kayak-com/ (last accessed August 17, 2012).

    [17]  http://www.businessinsider.com/kayak-ipo-2010-11 (last accessed August 17, 2012).

28

1    into a potentially significant loss of revenue.[18]

2    47.    Blink Booking, a mobile-only hotel booking service, echoed the claims of

3 competing online retailers, saying: "We've long believed that the big online travel agents have

4 been guilty of denying consumers the best prices – and that hotels' hands are tied by price parity

5 agreements.  The online travel market may appear to offer plenty of choice and competition, but

6 the reality is that there are lots of different shop windows selling the same rooms at the same

7 prices - with those prices agreed through parity deals between the big groups and the big OTAs

8 [online travel agents]."[19]

9    48.    The Hotel Defendants knew that the Online Retailer Defendants would enforce the

10 Agreements or refuse to sell the Hotel Defendants' rooms.  For example, in 2009, Defendant

11 Expedia refused to list or sell Room Reservations from Choice Hotels. Expedia's CEO and

12 President Dara Khosrowshahi explained:

13       '. . . As far as the discussions that we've had with Choice, we are
         not doing business with Choice right now on a chain basis.  We don't
14       have a vast majority of Choice hotels on our side,' said Khosrowshahi. . .

15       . . . he added, 'First of all, our primary goal is to have the
16       broadest, deepest set and highest quality set of inventory for the benefit
         of our customers.  And this doesn't signal any kind of change in our
17       overall philosophy as far as how we work with our hotel partners and
         what we're looking at.  It's not really an issue of economics; it's more
18       than issue of our wanting rate parity and inventory parity for our
         customers.'
19
20       'When our customers come to Expedia, we want them to know
         that they're getting the best prices and certainly, we are insistent on that.
21       And to the extent that Choice doesn't want to work under those terms.
         We won't be doing business with each other.  Those are the terms that
22       we work with our others strategic partners, they're comfortable where
         they were comfortable with it.  So, its nothing usual from what I would
23       say is typical practice for us in most of our other OTA competitors so to
         speak."[20]

24

25    ──────────────

         [18]  Karin Robinson-Jacobs, "Practice that holds rates steady among Hotel Defendants,
26 travel sites coming under fire," Dallas Morning News (Nov. 16, 2010), reprinted at
   http://hsmaidfw.blogspot.com/ (last accessed August 15, 2012).
27       [19]  http://www.telegraph.co.uk/finance/newsbysector/retailandconsumer/leisure/
   9441235/OFT-alleges-Intercontinental-Hotels-online-deals-broke-competition-law.html (last
28 accessed August 16, 2012).
         [20]  http://www.eyefortravel.com/distribution-strategies/expedia-stresses-rate-parity-and-
   inventory-parity-its-customers (last accessed August 17, 2012).

49.     Thus, the Online Retailer Defendants sought and received agreements from the Hotel Defendants that they would only sell to Online Retailers who would not discount the Rack Rate for Room Reservations, even if and when it reduced the Hotel Defendants' sales and/or profits by slowing sales of the Room Reservations.

50.     More specifically, the Hotel Defendants agreed to work with the Online Retailer Defendants to implement and enforce the RPM scheme to ensure that pricing by competing Online Retailers be restrained.

51.     The Online Retailer Defendants sought and obtained the agreement of the Hotel Defendants to impose and enforce "rate parity" – i.e., restraint on price competition – solely for the Online Retailer Defendants' benefit and not for any legitimate pro-competitive reason.

52.     The Online Retailer Defendants are driven to maintain their product and profit margins, as their margins are threatened by newer, more efficient internet retailers.  That dominant retailers, like the Online Retailer Defendants, would react anti-competitively to threats to their pricing freedom, such as those posed by new or more efficient retailers, has been acknowledged by the United States Supreme Court.

53.     The Supreme Court not only recognized that minimum resale pricing may be imposed by a dominant retailer for that retailer's benefit, but stated that such behavior violates the antitrust laws.  Indeed, the Supreme Court cautioned that:

> [r]esale price maintenance, furthermore, can be abused by a powerful manufacturer or retailer.  A dominant retailer, for example, might request resale price maintenance to forestall innovation in distribution that decreases costs.  A manufacturer might consider it has little choice but to accommodate the retailer's demands for vertical price restraints if the manufacturer believes it needs access to the retailer's distribution network. See Overstreet 31; 8 P. Areeda & H. Hovenkamp, Antitrust Law 47 (2d ed. 2004) (hereinafter Areeda & Hovenkamp); cf. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928,937-938 (CA7 2000).

***

> As should be evident, the potential anticompetitive consequences of vertical price restraints must not be ignored or underestimated.

*Leegin Creative Leather Prods., Inc.* v. PKS; Inc., 127 S. Ct. 2705, at 2719-20 (2007).

**C.     The RPM Scheme Has Purposefully Resulted in "Rate Parity" for Room Reservations through the Online Retailer Defendants - Allowing the Online Retailer Defendants to Always Guarantee the "Best" (Albeit Same) Prices**

54.     The RPM Scheme has achieved its illegal goal: Online Retailer Defendants do not compete on the basis of price for Room Reservations.  Rather, all online sales of Room Reservations for the same rooms are at the Rack Rate.

55.     Deposition testimony of Tim Gordon, Senior Vice President, of Priceline makes clear that each of the Online Retailer Defendants buys the rooms and sells the rooms to the public at exactly the same price:

> Q.     And in fact, sir, lets take a look at ALL22.  And this is a printout I did back in September for a night's stay at the Hilton in San Antonio. . . . $219 rate, taxes and then a total.  And then if you will look through, I've printed out from the various websites of the defendants, same hotel, same night.  Orbitz has its $219.00 rate. Cheap Tickets has its $219.00 rate.  Lowest Fare has a $219.00 rate.  Priceline, $219.00 rate.  Travel Now, $219.00.  Expedia, $219.00.  And Hotels.com, $219.00.  Every website lists this room on this night at the exact same room rate. And you know – you know, based upon the way the contracts work, that doesn't surprise you, does it?

> A.     No.

> Q.     And why doesn't that surprise you?

> A.     Because in general - and I can't be too specific because I don't know the exact terms of this agreement, but in general the contracts require us to take a net rate that they provide and mark it up by a specific amount.  And they require us to mark it up by that amount.

> Q.     By that exact amount?

> A.     Yes.

> Q.     And your understanding is that you have best price guarantee from Hilton where they can offer your competitors more heavy discounts than they can offer Priceline, correct?

> A.     That is true.

***

> Q.     All right. And so given the Most Favored Nations Clause that Hilton has, your understanding would be everybody – all these competitors are being provided this room at the same price and marking it up by the same amount resulting in the same retail rate, correct?

> A.     I believe that to be true.

56.    In fact, a federal court in the Western District of Texas recently commented on the similarity of the business models and pricing structures of the Online Retailer Defendants:

> After reviewing the record, it is clear that the Defendants not only engage in a common course of conduct, but that many of their business practices are virtually identical.  These practices include but are not limited to the manner in which they contract with the Hotel Defendants, the manner in which they determine and assess cancellation policies and fees, the <u>manner in which they determine the mark up and fees to arrive at an acceptable margin and retail/sell rate;</u> and, the manner in which they calculate, assess and pay hotel occupancy taxes.  The deposition testimony of the corporate representatives, standing alone, reflects an amazing similarity in practice, procedure and corporate methodology among all of the [Online Retailer Defendants].  <u>Memorandum and Opinion on Class Certification,</u> *City of San Antonio v. Hotels. com, et al.,* No. SA-06-CA-381-OG (W.D. Tex) (the "San Antonio Class Cert Order") at 18-19 (emphasis added).

57.    The Court determined, based upon deposition testimony, that the margins of each of the Online Retailer Defendants were identical to the other Online Retailer Defendants:

> Almost without exception, the net rate and sell rate for a given room on a given day are the same among the [Online Retailer Defendants] because the Defendants' agreements with the Hotel Defendants all contain "parity" or "Most Favored Nation" clauses.  This also makes the [ITC] margins the *same. Id. at 20, n21* (citations to deposition testimony omitted).

58.    This rate parity is demonstrated by examples of hotel rooms available for reservation on the Online Retailer Defendants' internet sites:

Holiday Inn San Diego on the Bay (9/29-9/30) posted 8/7/2012:

| | |
|---|---|
| Expedia Standard | $186 |
| Orbitz Standard | $186 |
| Priceline.com Standard | $186 |
| Travelocity .com Standard | $186 |
| Booking .com Standard | $186 |
| Holiday Inn website Standard | $186 |
| Expedia Deluxe | $235 |
| Hotels.com Deluxe | $235 |
| Orbitz Deluxe | $235 |
| Priceline.com Deluxe | $235 |
| Travelocity.com Deluxe | $235 |
| Booking.com Deluxe | $235 |

| Holiday Inn website Deluxe | $235 |
|---|---|

InterContinental Century City (9/29-9/30) posted 8/7/2012:

| Expedia Executive Suite | $375 |
|---|---|
| Hotels.com Executive Suite | $375 |
| Orbitz Executive Suite | $375 |
| Priceline.com Executive Suite | $375 |
| Travelocity .com Executive | $375 |
| Booking.com Executive Suite | $375 |
| Hotel website Executive Suite | $375 |

InterContinental San Francisco (9/29-9/30) posted 8/7/2012:

| Expedia Deluxe | $333 |
|---|---|
| Hotels.com Deluxe | $333 |
| Orbitz Deluxe | $333 |
| Priceline.com Deluxe | $333 |
| Travelocity.com Deluxe | $333 |
| Booking.com Deluxe | $333 |
| Hotel website Deluxe | $333 |

San Diego Marriott (9/22-9/23) posted 8/7/2012:

| Expedia Bayview | $240 |
|---|---|
| Hotels.com Bayview | $240 |
| Orbitz Bayview | $240 |
| Priceline.com Bayview | $240 |
| Travelocity.com | $240 |
| Booking.com Bayview | $240 |
| Hotel website | $240 |

LA Marriott Airport (9/29-9/30) posted 8/7/2012:

| Expedia Deluxe | $119 |
|---|---|
| Hotels.com Deluxe | $119 |
| Orbitz | $119 |
| Priceline.com | $119 |
| Travelocity .com | No listing |
| Booking.com Deluxe | $119 |

| Hotel website | $119 |
|---|---|

Marriott Marquis San Francisco (9/29-9/30) posted 8/7/2012:

| Expedia Deluxe | $389 |
|---|---|
| Hotels.com Deluxe | $389 |
| Orbitz Deluxe | $389 |
| Priceline.com Deluxe | $389. |
| Travelocity.com Deluxe | $389 |
| Booking.com Deluxe | $389 |
| Hotel website | $389 |
| Expedia City View | $414 |
| Hotels.com City View | $414 |
| Orbitz City View | $414 |
| Priceline.com City View | $414 |
| Travelocity.com City View | $414 |
| Bookie .com City View | $414 |
| Hotel website | $414 |

Hilton San Diego (9/22-9/23) posted 8/7/2012:

| Expedia Bay/City View | $185 |
|---|---|
| Hotels.com Bay/City View | $185 |
| Orbitz Bay/City View | $189 (refundable) |
| Priceline.com Bay/City View | $185 |
| Travelocity.com Bay/City View | $185 |
| Booking.com Bay/City View | $185 |
| Hotel website | $185 |

Hilton San Francisco (9/29-9/30) posted 8/7/2012:

| Expedia King | $459 |
|---|---|
| Hotels.com King | $459 |
| Orbitz King | $459 |
| Priceline.com King | $459 |
| Travelocity.com Standard King | $459 |
| Booking.com Standard King | $459 |
| Hotel website | $459 |

59.     That the rate parity results from the RPM scheme is clear.  The Online Retailer

1   Defendants employ "market managers" who "monitor closely a hotel's rates across all channels,

2   and if a preferential rate was given to one over the other that hotel could face dire penalties."[21]  In

3   fact, as Hotel Defendants started experimenting with price discounting by offering "tiered

4   pricing," the Online Retailer Defendants started to demand Hotel Defendants stop competing with

5   online retailers on price.

6        60.     An industry expert recounts that Hotel Defendants seeking to promote price

7   discounts in order to have consumers buy directly from the hotel were met with the Online

8   Retailer Defendants demanding price competition cease.  According to the industry source,

9   "Hilton, for example, is promoting like crazy to get the customer to book direct.  'Book with us

10  and get 500 extra points or free Internet.'"  But this competition was unacceptable to the Online

11  Retailer Defendants and contrary to the RPM scheme.  "That's where the [Online Retailer

12  Defendants] were forced to become big proponents of rate parity."  So the Online Retailer

13  Defendants ensured that the Hotel Defendants could not "undercut," *i.e., price compete*, by

14  entering into Defendant Retailer-Hotel Agreements and the RPM scheme.

15       61.     As a result of the "success" of the RPM scheme, the Online Retailer Defendants

16  are confident that all of the prices listed between them for the same room will be identical.  Thus,

17  they each offer a near identical "best price" guarantee – knowing it is the *only* price available

18  even among competitors.  Examples follow:

20       a.     **Travelocity's Guaranteed Low Prices**



TRAVELOCITY
GUARANTEE
(http://leisure.travelocity.com/Promotions/0,,TRAVELOCITY4818|mkt_main,00.html)

**Why Book With Us?**
Low Prices, Guaranteed
(http://leisure.travelocity.com/Promotions/0,,TRAVELOCITY4818|mkt_main,00.html)
Guaranteed Best Price: If you find a lower rate, we'll
pay the difference and send you $50.

---

[21]  HotelNewsNow.com, June 25, 2012, Does rate parity limit revenue managers?

b.    **Expedia's Best Price Guarantee**



We're so confident you'll find the best price for your trip here on Expedia that we guarantee it. Find a cheaper trip within 24 hours of booking and we'll refund the difference and give you a travel coupon worth $50.

c.    **Booking.com Best Price Guarantee**

# Best Price Guaranteed

We promise that when you book with us, you'll get the lowest possible price for your room. Guaranteed.

d.    **Hotels.com Price Match Guarantee**

## Price Match

The hotels.com Price Match Guarantee protects your pocket book and takes the worry out of booking a hotel room. After you book with hotels.com, if you find a lower publicly available rate online for the same dates, hotel, and room category, we will match the price and refund you the difference.

e.    **Orbitz Low Price Guarantee**



## Orbitz Low Price Guarantee

Look for our hotel and car rates backed by our Low Price Guarantee. We're so confident they're the lowest online, we're willing to put money on it.

### Hotel Low Price Guarantee Terms and Conditions:

If you book a qualifying prepaid hotel rate on the Orbitz Web site, and then find the same room, in the same hotel, for the same dates, at a lower price online, before taxes and fees, we'll refund the difference and give you a $50 discount on a future hotel booking.

62.     Absent the RPM scheme, the Online Retailer Defendants could not offer the best price guarantees *unless* they engaged in price competition and discounted the Rack Rates.

63.     The RPM Agreements, and the scheme in restraint of trade, have harmed competition in the relevant market(s) and caused prices to be higher in the relevant market(s) then the prices would have been without the Agreements.

64.     In addition, the uniform adoption and enforcement of "rate parity" and most favored nation clauses by the Online Retailer Defendants is a horizontal *per se* price fixing agreement.

65.     The Agreements were specifically intended to protect the Defendants from price competition - both from Hotel Defendants and other highly efficient retailers - offering the same inventory.  Thus, Defendants agreed to restrain competition by mandating higher price levels and thereby neutering the competition or by eliminating the price cutting entirely.  This scheme achieved its goals, and thereby substantially inflated prices to consumers like the Plaintiff.

**D.     Investigation by Governmental Authorities**

66.     This price-fixing conspiracy is evidently not confined to the United States.  The British Office of Fair Trade ("OFT") recently issued a "Statement of Objections" alleging that Expedia, Inc. infringed competition through the very same price fixing agreements with respect to British hotel rooms.  The *Telegraph* reported that Expedia admitted that "it has engaged in cartel conduct on breach of the law," and is "providing information on its rivals under a 'leniency deal'" with the British authorities.

67.     The British revelations leave no room for doubt: the Online Retailer Defendants are entering into contracts with the same Hotel Defendants in this country and to the same anti-competitive effect.  The Agreements are part of an anti-competitive scheme under which the Online Retailer Defendants leveraged their substantial market power and dominance to induce the Hotel Defendants into agreeing to do one or more of the following: (a) impose minimum resale price maintenance agreements on competing Online Retailers; (b) enforce the price maintenance agreements as to the Online Retailers; and/ or (c) cut off supply to price-cutting Online Retailers.

68.     In sum, the Hotel Defendants did *not* and are *not* simply or unilaterally:

        a.     refraining from selling to uncongenial retailers;

        b.     suggesting resale prices that were widely followed;

        c.     sanctioning, terminating or refusing to sell to retailers who failed to maintain a minimum resale price;

        d.     announcing and enforcing policies of sanctioning, terminating or refusing to sell to retailers who failed to maintain a minimum resale price; or

        e.     sanctioning, terminating or refusing to sell to other retailers following, or in response to, complaints by retailers such as the Online Retailer Defendants.

69.     Rather, the Agreements represent a conscious commitment to a common scheme, designed to achieve an unlawful objective, between the Online Retailer Defendants, the Hotel Defendants (including Intercontinental), and other online retailers.

70.     The Hotel Defendants did not act unilaterally or independently, or in their own economic interests, when:

        a.     entering into the Defendant Retailer-Hotel Agreements;

        b.     seeking online retailers' acquiescence to, and compliance with, the terms of the Hotel- Online Retailer Agreements;

        c.     seeking to have retailers charge minimum resale prices; or

        d.     terminating or refusing to sell to online retailers for violating the Agreements.  In fact, absent threatened penalties or sanctions by the Online Retailer Defendants, it would not be in the Hotel Defendants' economic interest to enter into, maintain, or enforce the Agreements.

## VI.     MONOPOLY/MARKET POWER

71.     The relevant product market in this case is direct online retail sales of Room Reservations.

72.     The relevant geographic market in this case is the United States and/or the State of California.

73.     By virtue of their power to control prices and exclude competition in the relevant

market(s), the Online Retailer Defendants at all relevant times possessed monopoly power in the relevant market(s). The Online Retailer Defendants and their subsidiaries hold over a 50 percent market share in the internet travel business market. Just Expedia and its subsidiaries alone account for approximately 50% of the internet travel business market. Moreover the Online Retailer Defendants possess a dominant share of the market(s) for online retail sales of Room Reservations.

## VII.   MARKET EFFECTS OF AND ANTITRUST INJURY DUE TO DEFENDANTS' ANTICOMPETITIVE CONDUCT

74.     The overall effect of Defendants' anti-competitive, exclusionary scheme has been to substantially foreclose and impair competition (and the threat of such competition) from lower-priced Room Reservations. As alleged above, had the Defendants not improperly foreclosed or stifled actual or potential competitors from competing in the market for Room Reservations, other actual or potential rival retailers would have achieved much greater sales than they actually did (or threatened to do), given the lower prices that they charged (or could have charged upon entry), and would have posed a far greater competitive threat to the Defendants. Additionally, absent the Defendants' exclusionary conduct, barriers to entry to the market would have been lower, which: (a) would have made it easier for existing or new competitors to enter or expand their positions in the market for Room Reservations, and (b) would have caused existing or potential competitors to be attracted to the Room Reservation market because of the supracompetitive prices that the Defendants were charging. As a result, absent the Defendants' misconduct, the Defendants would have rationally perceived that there was a greater threat of potential competition in the relevant market if the Defendants did not reduce their supra-competitive prices.

75.     The presence of unfettered competition from actual or potential competitors, which were selling lower-priced Room Reservations, would have forced the Defendants to lower the prices for their Room Reservations in order to remain competitive and/or to counter a perceived threat of additional entry.

76.     During the relevant period, Plaintiff and the other members of the Class purchased Room Reservations directly from the Defendants. As a result of the Defendants' alleged illegal

1  conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for

2  the Room Reservations they purchased.  Plaintiff would have been able to, inter alia, purchase

3  less-expensive Room Reservations had potential competitors been able to engage in unfettered

4  competition.  The prices that Plaintiff and the other Class members paid for Room Reservations

5  during the Class Period were substantially greater than the prices that Plaintiff and the Class

6  members would have paid absent the illegal conduct alleged herein because: (1) the prices of all

7  Room Reservations were artificially inflated by the Defendants' illegal conduct; and (2) Class

8  members were deprived of the opportunity to purchase Room Reservations from the Defendants'

9  competitors at substantially lower prices.  Thus, Plaintiff and the Class have, as a consequence,

10  sustained substantial damages in the form of overcharges.

## VIII.   CLASS ALLEGATIONS

12       77.    Pursuant to Rule 23 of the Federal Rules Of Civil Procedure, Plaintiff brings this

13  class action on behalf of him/herself and all members of the following class (the "Class"):

> All persons and entities throughout the United States who paid for
> a room at a Defendant Hotel reserved through the Online Retailer
> Defendants.  Expressly excluded are (i) room reservations made as
> part of a package deal; or (ii) room reservations made without
> disclosure of the name of the hotel until after paying for the room
> reservation.

       78.    Pursuant to Rule 23 of the Federal Rules Of Civil Procedure, Plaintiff bring this

class action on behalf of him/herself and all members of the following subclass (the "California

Class"):

> All persons and entities throughout the State of California who
> paid for a room at a Defendant Hotel reserved through the Online
> Retailer Defendants.  Expressly excluded are (i) room reservations
> made as part of a package deal; or (ii) room reservations made
> without disclosure of the name of the hotel until after paying for
> the room reservation.

24       79.    Plaintiff believes that the Class and California Class include thousands of

25  consumers and businesses across the United States, though the exact number and the identities of

26  the Class members are currently unknown.

27       80.    The members of the Class and California Class are so numerous that joinder of all

28  Class members is impracticable.

CLASS ACTION COMPLAINT                                                                    - 24 -

81. Common questions of law and fact exist as to all members of the Class and California Class and predominate over any questions affecting solely individual members of the Class and California Class. Nearly all factual, legal, and statutory relief issues raised in this Complaint are common to each of the members of the Class and California Class and will apply uniformly to every member of the Class and California Class. Among the questions of law and fact common to Class and California Class members are:

a. whether Defendants engaged in agreements, contracts, combinations, and conspiracies, which had the purpose and/or effect of unreasonably restraining competition and limiting purchaser access to competing and lower-priced Room Reservations;

b. whether Defendants unreasonably restrained trade;

c. whether Defendants' anti-competitive contracts, combinations, and conspiracies have caused Plaintiff and the other members of the Class and California Class to suffer antitrust injury in the nature of overcharges;

d. whether Defendants' unlawful conduct caused Plaintiff and other Class and California Class members to pay more for the Room Reservations than they otherwise would have paid;

e. the appropriate Class-wide measure of damages;

f. whether, and in what amount, Plaintiff and the other Class and California Class members are entitled to recover treble damages, court costs, and attorneys' fees;

g. whether Defendants' anti-competitive conduct is continuing, thus entitling the Class and California Class to injunctive relief to promote unrestrained trade and free and fair competition.

82. Plaintiff's claims are typical of the claims of other members of the Class and California Class because Plaintiff and every member of the Class and California Class have suffered similar injuries as a result of the same practices alleged herein. Plaintiff has no interest adverse to the interests of the other members of the Class and California Class.

83. Plaintiff will fairly and adequately represent and protect the interests of the Class and California Class. Plaintiff has retained able counsel with extensive experience in class action

1  litigation.  The interests of the Plaintiff are coincident with, and not antagonistic to, the interests

2  of the other Class and California Class members.

3      84.   The questions of law and fact common to the members of the Class predominate

4  over any questions affecting only individual members, including legal and factual issues relating

5  to liability and damages.

6      85.   Plaintiff and other members of the Class have suffered damages as a result of

7  Defendants' unlawful and wrongful conduct.  Absent a class action, Defendants will retain

8  substantial funds received as a result of their wrongdoing, and such unlawful and improper

9  conduct shall, in large measure, go unremedied.  Absent a class action, the members of the Class

10  will not be able to effectively litigate these claims and will suffer further losses, as Defendants

11  will be allowed to continue such conduct with impunity and retain the proceeds of its ill-gotten

12  gains.

13      86.   A class action is superior to other available methods for the fair and efficient

14  adjudication of this controversy because joinder of all Class members is impracticable.

15  Moreover, because the damages suffered by individual members of the Class are relatively small,

16  the expense and burden of individual litigation make it impossible for members of the Class to

17  individually redress the wrongs done to them.  The Class is readily definable, and prosecution of

18  this action as a class action will eliminate the possibility of repetitious litigation.  There will be no

19  difficulty in the management of this action as a class action.

20  **IX.   TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT**
    **CONCEALMENT, EQUITABLE TOLLING AND CONTINUING VIOLATIONS**
21
22      87.   Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth

    herein.
23
24      88.   Plaintiff did not discover and could not have discovered through the exercise of

25  reasonable diligence the existence of the claims sued upon herein until immediately prior to

    commencing this civil action.
26
27      89.   Any applicable statutes of limitation have been tolled by Defendants' affirmative

28  acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above

1    reveal.

2        90.    Because of the self concealing nature of Defendants' actions and their affirmative

3    acts of concealment, Plaintiff and the Class assert the tolling of any applicable statutes of

4    limitations affecting the claims raised herein.

5        91.    Defendants continue to engage in the deceptive practice, and consequently,

6    unwary consumers are injured on a daily basis by Defendants' unlawful conduct.  Therefore,

7    Plaintiff and the Class submit that each instance that Defendants engaged in the conduct

8    complained of herein and each instance that a member of the Class purchased a Room

9    Reservation constitutes part of a continuing violation and operates to toll the statutes of limitation

10   in this action.

11       92.    Defendants are estopped from relying on any statute of limitations defense because

12   of their unfair or deceptive conduct.

13       93.    Defendants' conduct was and is, by its nature, self-concealing.  Still, Defendants,

14   through a series of affirmative acts or omissions, suppressed the dissemination of truthful

15   information regarding their illegal conduct, and have actively foreclosed Plaintiff and the Class

16   from learning of their illegal, anti-competitive, unfair and/or deceptive acts.

17       94.    By reason of the foregoing, the claims of Plaintiff and the Class are timely under

18   any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine,

19   and fraudulent concealment.

20                              **X.     COUNTS**

21                              **COUNT I**

22                    **VIOLATION OF 15 U.S.C. § 1**
                **(AGREEMENTS UNREASONABLY RESTRAINING TRADE)**
23
         95.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though
24
     fully set forth herein.
25
         96.    The Agreements, and their enforcement, constitute contracts, combinations and
26
     conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s),
27
     and harmed Plaintiff and the Class thereby.
28

97.     The Agreements cover a sufficiently substantial percentage of relevant market(s) to harm competition.

98.     The Defendants are liable for the creation, maintenance, and enforcement of the Agreements under a *per se*, "quick look" and/or rule of reason standard.

99.     The Defendants possess market power.

100.    The Agreements harm competition by artificially raising and stabilizing prices.

101.    There is no legitimate, pro-competitive business justification for the Agreements or any of them that outweighs their harmful effect.  Even if there were some conceivable justification, the Agreements are broader than necessary to achieve such a purpose.

102.    Plaintiff and members of the Class were injured in their business or property by the collusion and conspiracy alleged above which facilitated, enabled, assisted or furthered Defendants' substantial foreclosure and exclusion of competition in the relevant market(s).

103.    Without limiting the generality of the foregoing, Plaintiff and the other members of the Class have been forced to pay higher prices for Room Reservations than they would have paid in the absence of Defendants' unlawful conduct.

## COUNT II

### VIOLATION OF THE CARTWRIGHT ACT
**(CALIFORNIA BUSINESS & PROFESSIONS CODE SECTIONS 16720, *et seq.*)**
**(CALIFORNIA CLASS ONLY)**

104.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

105.    Defendants engaged in price-fixing and a *per se* violation of the Cartwright Act.

## COUNT III

### FOURTH CAUSE OF ACTION
**(Violations of Cal. Bus. & Prof. Code § 17500 *et seq.*)**

115.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs set forth above.  This count is asserted against the online retailer defendants.

116.    Defendants' use of various forms of advertising media to advertise, call attention to or give publicity to the sale of their goods and services, and other practices, as set forth above,

1  which are not as advertised or as otherwise represented, constitutes unfair competition, unfair,

2  deceptive, untrue or misleading advertising, under Business & Professions Code Section 17500 *et*

3  *seq.* These advertisements and practices have deceived, and are likely to deceive, the consuming

4  public, in violation of those sections.

5      117.    Defendants' business acts and practices, as alleged herein, have caused injury to

6  the Plaintiff who would not have paid as much for online rooms had he/she known the truth.

7      118.    Plaintiff and the Class are entitled to restitution and/or other equitable relief in

8  light of the practices described herein.

9      119.    Defendants' practices in connection with the marketing and sale of online rooms

10  violate the CLRA in at least the following respects:

11      a.      In violation of Section 1770(a)(5), Defendants knowingly misrepresented the

12              character, uses and benefits of the rooms;

13      b.      In violation of Section 1770(a)(9), Defendants have knowingly advertised the

14              online rooms with the intent not to sell there as advertised; and

15      c.      In violation of Section 1770(14), Defendants knowingly misrepresented the legal

16              rights, obligations, or remedies involved in the purchase and sale of online rooms.

17      120.    Defendants' misrepresentations, failure to disclose, and knowing concealment of

18  the prices for online rooms are misrepresentations, omissions, and concealments of material fact

19  that constitute unfair and/or deceptive business practices in violation of Civil Code Section

20  1770(a) and caused harm to Plaintiff and Class members who would not have purchased and/or

21  paid as much for their rooms had they known the truth.

22      121.    In accordance with Civil Code § 1780 (a), Plaintiff and members of the Class seek

23  injunctive and equitable relief for violations of the CLRA. In addition, after mailing appropriate

24  notice and demand in accordance with Civil Code § 1782(a) & (d), Plaintiff will subsequently

25  amend this Class Action Complaint to also include a request for damages. Plaintiff and members

26  of the class request that this Court enter such orders or judgments as may be necessary to restore

27  to any person in interest any money which may have been acquired by means of such unfair

28  business practices, and for such other relief, including attorneys' fees and costs, as provided in

1     Civil Code § 1780 and the Prayer for Relief.

2     **COUNT IV**

3     **FIFTH CAUSE OF ACTION**
**(Violations of Cal. Bus. & Prof. Code § 17200 *et. Seq.*)**

4

5     122.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the

6     paragraphs set forth above.

7     123.    This Count is asserted against the Online Retailer Defendants on behalf of the

8     California subclass.

9     124.    Defendants have engaged in unfair competition within the meaning of California

10     Business & Professions Code Section 17200 *et seq.* because Defendants' conduct is unlawful,

11     misleading, and unfair as herein alleged.

12     125.    Defendants' business practices are unlawful because they violate the CLRA, as

13     well as other statutes alleged herein.

14     126.    The practices are misleading because they were likely to deceive consumers into

15     believing that they are obtaining the "best price" or a "low price" for their hotel room.

16     127.    Defendants' business practices, and each of them, are unfair because they offend

17     established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or

18     substantially injurious to consumers, which harm greatly outweighs any benefit associated with

19     the business practice, in that consumers are led to believe that the rooms they were paying for had

20     qualities that it did not.

21     128.    Plaintiff has standing to pursue this claim because he/she has been injured by

22     virtue of suffering a loss of money and/or property as a result of the wrongful conduct alleged

23     herein.  Plaintiff would not have purchased his/her hotel room or paid as much for it had they

24     known the truth.

25     129.    Plaintiff and the Class are entitled to relief, including full restitution and/or

26     restitutionary disgorgement, to the greatest extent permitted by law, which may have been

27     obtained by Defendants as a result of such business acts or practices, and enjoining Defendants to

28     cease and desist from engaging in the practices described herein.

1

**RELIEF REQUESTED**

2        **WHEREFORE**, Plaintiff, on his behalf and on behalf of the Class, prays for judgment, as

3   follows:

4        A.       For an Order certifying this case as a class action against Defendants and

5   appointing Plaintiff as Representative of the Class;

6        B.       For money damages against Defendants and in favor of Plaintiff and the Class on

7   all claims asserted in this Complaint;

8        C.       For costs of suit incurred herein;

9        D.       For prejudgment interest to the extent allowed by law;

10       E.       For penalties as allowed by law;

11       F.       For permanent injunctive relief to enjoin further violations of the law; and

12       G.       For such other and further relief as this Court may deem just and proper.

13

**JURY TRIAL DEMANDED**

14       Plaintiff hereby demands a trial by jury on all issues triable of right by jury.

15

16   Dated: August 30, 2012

17
Todd A. Seaver (SBN 271067)
BERMAN DEVALERIO
18   One California Street
Suite 900
19   San Francisco, CA 94111
Telephone:    (415) 433-3200
20   Facsimile:    (415) 433-6382
tseaver@bermandevalerio.com

21   Kit A. Pierson
Meghan M. Boone
22   COHEN MILSTEIN SELLERS & TOLL
PLLC
23   1100 New York Avenue, N.W.
Suite 500, West Tower
24   Washington, DC  20005
Telephone:    (202) 408-4600
25   Facsimile:    (202) 408-4699
kpierson@cohenmilstein.com
26   mboone@cohenmilstein.com

27

28